UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 17 CR 299 |
| v. | ) | |
| | ) | Hon. John J. Tharp, Jr. |
| TIMOTHY DORSEY | ) | District Judge |

**GOVERNMENT'S POSITION PAPER
REGARDING SENTENCING FACTORS**

Timothy Dorsey exploited young men, and later a young woman, as prostitutes in his national sex-trafficking operation. He preyed on young people with troubled family situations, mental health and drug abuse issues, and he emotionally and physically abused them while they were involved in his organization. Dorsey controlled where they worked and took half the money they made. Dorsey persisted in his prostitution operation even after getting out of jail for a Georgia prostitution conviction in 2016. He threatened his workers that he'd beat up or kill anyone who left his organization and began prostituting on his own. In February 2015, he made good on his threat, directing Anthony Mrdjenovich to murder Philip Scheau, one of Dorsey's former workers who had left Dorsey's organization approximately a week earlier and was working on his own as a prostitute.

Dorsey's crimes and his failure to be deterred by multiple arrests and a prior conviction warrant an above-Guidelines sentence within a range of 8-10 years' imprisonment under 18 U.S.C. § 3553 in order to adequately punish the seriousness of the offense, deter the defendant, and protect the public.

I.    **THE PRESENTENCE INVESTIGATION REPORT**

    A.    **Dorsey's Plea to the Illinois and Georgia Indictments**

Dorsey was charged by indictment in the Northern District of Illinois with five counts of transporting individuals in interstate commerce with the intent that they engage in prostitution on various dates in 2014 and 2015, in violation of 18 U.S.C. § 2421, in *United States v. Timothy Dorsey*, 17 CR 299 (the "Illinois Indictment").

Dorsey was charged in the Middle District of Georgia with one count of transporting an individual in interstate commerce with the intent that the individual engage in prostitution between November and December 2016, in violation of 18 U.S.C. § 2421, in *United States v. Timothy Dorsey*, 18 CR 13 (the "Georgia Indictment"). The Georgia Indictment was transferred to the Northern District of Illinois, pursuant to Fed. R. Crim. P. 20, and assigned case number 19 CR 299.

On April 25, 2019, Dorsey pleaded guilty to Count One of the Illinois Indictment and to the Georgia Indictment, pursuant to a written plea agreement. R.58.

    B.    **The Probation Office's Advisory Guidelines Calculation**

The United States Probation Department, using the November 2018 Guidelines Manual, calculated defendant's Guidelines range as follows:

**Illinois Indictment**

   14    Base offense level, pursuant to USSG § 2G1.1(a)(2) and (d) for each of the counts involving victims Individuals A through E;

**Georgia Indictment**

   14    Base offense level, pursuant to USSG § 2G1.1(a)(2)

**Multiple Count Adjustment**

Each of the five counts of the Illinois Indictment and the single count of the Georgia Indictment are assigned one unit pursuant to Guidelines §§ 2G1.1(d) and 3D1.4. The total number of units is 6, resulting in a 5 level increase to the offense level for the Group with the highest offense level. As a result, the combined adjusted offense level is 19.

**- 3**     Acceptance of responsibility, pursuant to USSG § 3E1.1

**16**     **Total Offense Level**

PSR at 9-12.

Defendant has a criminal history category of II. PSR at 14. Defendant has a 1996 conviction for theft in Cook County, Illinois, and a 2016 conviction for pimping in Dekalb County, Georgia. *Id.*

 The Probation Office calculated that, with an offense level of 16 and a criminal history score of II, defendant's advisory Guidelines range is 24 to 30 months' imprisonment. PSR at 23.

C.     **Acceptance of Responsibility Reduction**

The government does not object to the Probation Office's calculation of the applicable Guidelines range. However, while the government indicated in both the plea agreement and its Government's Version that Dorsey deserved a reduction in his offense level pursuant to Guideline § 3E1.1 for acceptance of responsibility, Dorsey's statements to the Probation Office calls his acceptance into question. In particular, when interviewed by the Probation Office regarding his business, Dorsey stated that he "wanted to provide opportunities (such as being a massage therapist) to people with 'limited opportunity' and said that "he wanted to 'provide legal

3

companionship to lonely people' and 'didn't want to run a whorehouse.'" PSR at 8. He further stated that he "turned a 'blind eye' to employees engaging in sexual conduct. *Id.*

Dorsey's characterization of the purpose and nature of his prostitution operation is wholly false. Dorsey knew he was prostituting men using the cover of "massage therapy" and he further knew – and expected – that his workers perform sex acts on their clients. Not only did numerous former workers of Dorsey testify to these facts, but their statements are corroborated by text messages, found on phones in Dorsey's possession when he was arrested in Brookhaven, Georgia, in September 2015, on which Dorsey, who made his workers' appointments, was explicitly promising that his masseurs would perform sex acts with the clients. Further, Dorsey was recorded in a telephone conversation in late November 2016, with former worker Individual D, in which he discussed the possibility of Individual D returning to work with Dorsey.[1] *See* Exhibit O. Individual D told Dorsey that he was looking to make $1,500–2,000 a week performing massages that included "blow jobs." Dorsey stated that he believed that Individual D had been making that sum when Individual D was working for Dorsey. Individual D complained that although sometimes he made that much, other times he would be in Arizona and make only $800 or $1,000. Dorsey responded, "Well, you gotta understand, you know, I been doing this for a long time, and I'm not going to deliberately take you somewhere where you're not gonna make

---

[1] Due to the voluminous nature of the Government's exhibits, a copy of all exhibits referenced in this position paper will be submitted to this Court with copy to defense counsel in advance of sentencing.

a whole lot of money." Dorsey and Individual D discussed how much Individual D wanted to charge for a "blow job" as opposed to a "hand job." Dorsey explained that Masseurfinder would not let him post anything that explicitly advertised sexual acts; Dorsey added, however, that he could offer that Individual D would perform those acts when he spoke to the client directly. During the same recorded call, Dorsey asked Individual D what he wanted to charge. When Individual D said he wanted to charge $150 for a massage with a blow job, Dorsey responded:

> I hear what you're saying. But I have to say, that you've been doing this long enough to know what 150 an hour means to these clients. You know, they're, they're gonna want some penetration. Somebody's, for 150, somebody's fucking somebody.

Dorsey's own statements demonstrate that he lied to the Probation Office when he claimed he wanted to run a legal business and instead turned a "blind eye" to sexual conduct by his workers.

The fact that Dorsey pleaded guilty to the offenses he was charged with does not entitle him to a reduction in his offense level for acceptance of responsibility as a matter of right. *See* Guideline § 3E1.1, App. Nt. 3. Instead, while entry of a guilty plea "combined with truthfully admitting the conduct comprising the offense of conviction" is "significant evidence" of acceptance of responsibility, it "may be outweighed by conduct of the defendant that is inconsistent with such acceptance of responsibility." *Id.* Dorsey's statements to the Probation Office are in stark contradiction to the facts and his own admissions in his guilty plea. Dorsey's choice to deny and minimize his offense conduct in this manner strongly suggests that he has not accepted responsibility for his offense.

### D. **Probation Office's Recommendation**

The Probation Office recommends that this Court impose an above Guidelines sentence of 60 months' imprisonment on each count of conviction, to be served concurrently. In support of its above-Guidelines recommendation, the Probation Office cites Dorsey's involvement in the murder of Philip Scheau, Dorsey's phone abuse (for profit) while incarcerated, Dorsey's lies to the Probation Office regarding the reasons for his dishonorable discharge from the U.S. Army, and Dorsey's failure to be deterred from criminal conduct, specifically, prostitution, despite his 2016 conviction for pimping in Georgia.

## II. THE 3553(A) FACTORS WARRANT AN ABOVE-GUIDELINES RANGE SENTENCE

Criminal sentencing has four purposes - retribution, deterrence, incapacitation, and rehabilitation. *United States v. Milbourn*, 600 F.3d 808, 812 (7th Cir. 2010). Section 3553(a) requires the court to impose a sentence that is "sufficient, but not greater than necessary," to comply with the purposes of sentencing.[2] In defendant's case, a sentence significantly above the Guidelines range is needed to take into account the nature and circumstances of the offense as well as defendant's history and characteristics, and satisfies the purposes of sentencing, in particular the need to reflect the seriousness of the offense, to provide just punishment and to deter defendant and others.

---

[2] Those purposes are the need for the sentence "(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." §§ 3553(a)(2)(A)-(D).

Timothy Dorsey recruited young men and women who were struggling with emotional and substance abuse issues into his national prostitution operation. Many of his recruits had never engaged in prostitution prior to working for Dorsey. Dorsey took half of what his recruits made per commercial sex act. He facilitated their drug abuse. He manipulated them into remaining with him through a combination of threats, verbal abuse, financial rewards, physical abuse, and pretended friendship. The harm Dorsey inflicted on these young men and women – who, although not minors, were very young adults would be enough, in and of itself, to justify an above-Guidelines sentence.

In addition, Dorsey has already demonstrated to this Court that arrest and imprisonment is not a deterrent. When he was arrested in Brookhaven, Georgia, in September 2015, he sent postcards to Individual B, one of his workers, directing him, in code, to continue to commit acts of prostitution and direct other workers to do the same, so that the proceeds could be sent to Dorsey in prison. *See* Exhibit P. Within months of his release from prison in June 2016, he was back out recruiting participants to further his prostitution operation. He tried to recruit Individual D back into his operation, and he was arrested in December 2016 in Valdosta, Georgia, after setting up a meet between an undercover detective and Individual B.H., who Dorsey had been prostituting. When in custody in Valdosta after his December 2016, he passed letters to his co-defendant, Matthew Lenzi, while in prison. *See* Exhibit Q. In those letters, he encouraged Lenzi to lie to police so that he and Lenzi could either get acquitted or obtain a more favorable plea deal. In addition, his misconduct in

7

federal prison – selling his phone password in exchange for thousands of dollars – further illustrates his disrespect for the law.

Further, he lied to the Probation Officer during the preparation of the PSR: he lied regarding the reasons for his dishonorable discharge from the U.S. Army, and he minimized his role and responsibility for the offenses he pleaded guilty to in this case. Defendant's demonstrated disregard for the law despite a prior conviction, as well as his lack of acceptance of responsibility for his offense, also supports a conclusion that a Guidelines sentence is wholly insufficient to protect the public and deter the defendant.

Finally, an above-Guidelines sentence is needed to hold Dorsey responsible for his role in Philip Scheau's death. After years of promising his recruits that he would harm them if they decided to go into business for themselves, he followed through on that threat when he directed his worker Anthony Mrdjenovich to murder Philip Scheau, who had left Dorsey's business just two weeks before he was murdered. Mrdjenovich, who was convicted of Scheau's murder at trial, traveled to Chicago with Dorsey, in a car Dorsey rented. Mrdjenovich, although he repeatedly lied about who pulled the trigger, consistently stated that Dorsey drove him to the Motel 6 in Schiller Park to meet with Scheau, and provided the gun used in the murder. As set forth in more detail below, Mrdjenovich's statements regarding Dorsey's involvement in that murder are corroborated by circumstantial evidence placing Dorsey in the Chicago area with Mrdjenovich, telephone records, and multiple reports by other Dorsey recruits that Dorsey had made threats to murder them if they left his employment.

A significantly above-Guidelines sentence is needed to hold Dorsey responsible for the full extent of his criminal conduct, and given his history of criminal activity, to protect the public and deter Dorsey from future crime.

### A.  The Nature and Circumstances of the Offense

### 1.  Scope of Dorsey's Sex Trafficking

Dorsey's involvement in sex trafficking dates back to at least 2011. At first, Dorsey headquartered his operation in Chicago at apartments in Elk Grove Village, and on the 4100 block of N. Clarendon Ave. in the Uptown/Buena Park neighborhood of Chicago. From Chicago, he directed the young men he had recruited into his operation to travel all over the country by plane, bus, and automobile. Plea, R.58 at 5. Dorsey advertised the men's services, set up appointments, and collected half of the fee paid by clients. *Id.* Dorsey ran his business until his September 2015 arrest in Georgia on charges of human trafficking and pimping, which arose after one of the workers he recruited called 911 and claimed to have been lured down to Georgia under the pretense of working for a DJ company.[3] He ultimately entered an Alford plea to the pimping charge, was sentenced to a year's imprisonment, and released from custody in June 2016. PSR at 14. He re-started his prostitution operation and

---

[3] This worker, Individual K.L., was not truthful with law enforcement when he claimed he did not know that he would be asked to perform sex acts. As Facebook Messenger chats between Dorsey's co-defendant Chris Carrera and Individual K.L. indicate, Individual K.L. was told he might have to let the clients touch him, although K.L. stated he would not allow that to happen. One of the officers who interviewed Individual K.L. after he called 911 noted that K.L. appeared to be high on methamphetamine. In investigating K.L.'s claims, Brookhaven Police seized phones and other electronic media containing Dorsey's communications with clients concerning prostitution.

by November 2016, based on his own statements in a recorded call with Individual D, was prostituting men and women again.[4]

Shortly thereafter, on December 6, 2016, Dorsey was arrested in a prostitution sting in Valdosta, Georgia, for prostituting Individual B.H., a female. Dorsey had been prostituting Individual B.H. throughout the United States in the same manner in which he prostituted the young men previously employed by him. Dorsey booked and paid for Individual B.H's rental cars and hotel stays. Dorsey also drove Individual B.H. across state lines to engage in prostitution. Dorsey posted ads for Individual B.H., booked Individual B.H.'s appointments, and once an appointment was booked with a customer, Dorsey provided Individual B.H. with instructions concerning, among other things, the timing and location of the appointment. Dorsey collected a portion of whatever Individual B.H. was paid by a customer for the appointment.

### B. Dorsey's Concealment of his Operation

Dorsey concealed his illegal operation by claiming he was operating a DJ company. He instructed his recruits that, if questioned, they should say that they worked for his DJ company, Cobalt Recordings. *See* Exhibit A at 7. Dorsey himself claimed to Brookhaven, GA police that he was operating a DJ company and explained

---

[4] Specifically, on November 28, 2016, at the FBI's direction, Individual X (Individual D) placed a call to Dorsey in which he asked to come back to work for Dorsey. Dorsey agreed to let him do so, but stated, among other things, that "he had a guy and a girl with him now" and that if Individual X came back, he couldn't talk about the people who used to work for Dorsey, stating, "I mean, I don't want all this stuff brought up. I got good people over here, I have some bad ass motherfuckers over here who are happy to be here, and I want it to stay that way. Alright?..Especially these females. Cause they're not fucking around. I mean they are, but they are not playing. These bitches are not playing." *See* Exhibit O.

that he had heard that some of his workers were doing massages with "happy endings" on the side.

However, as his bank records and credit card records make clear, Dorsey's income was almost entirely cash, and his expenditures were consistent with his operation of a prostitution enterprise, not a DJ company. For example, between January 2013 and September 2014, of the $405,204.10 in credits to his Citibank account ending in X8130, $365,698.91 were cash deposits. When he was arrested in Brookhaven, Georgia, in September 2015, he had numerous cell phones, gift cards, debit cards, and cash in excess of $6,000 in his Audi sedan and motel room. When he was arrested in Valdosta, Georgia, in December 2016, he had $32,970 in cash on his person, as well as multiple phones, electronic storage media, and 27 debit/credit cards.

### C. Dorsey Persisted in Criminal Conduct While in Custody

Even when in custody – first in 2015-2016, when he was incarcerated in Dekalb County, Georgia, and again when he was arrested in 2018 in Valdosta, Georgia, Dorsey attempted to operate his prostitution business.

First, on October 1, 2015, Individual B was interviewed by FBI agents. In addition to discussing his work for Dorsey, he advised agents that he had received two postcards from Dorsey from a jail in Georgia. *See* Exhibit P. The first instructed him to have "Anthony" put $75 per week on commissary books for Dorsey and Chris Carrera. He instructed them to "use the Challenger and rental car only. Do not drive the Mustang for any reason at all." The postcard instructed Individual B to "save all the money you guys have now, and from any gigs. We need all the money we can get

11

for bail. He then instructed Individual B to "go to St. Louis, Denver, and Phoenix and take all the gigs you can" and "tell Anthony to go to Dallas, Houston, Austin and San Antonio for DJ gigs and to collect from clubs that owe." He concluded with the command to "Make sure you both stop <u>everything</u> and take care of <u>everything</u> on this postcard immediately! Don't worry we are fine and will see you guys very soon." Individual B told FBI agents that he interpreted "gigs" as code for prostitution since he did not know Dorsey to be doing real DJ work.

Further, when incarcerated in Georgia arising out of his arrest for his involvement in prostituting Individual B.H, Dorsey attempted to manipulate Matthew Lenzi, who traveled with Dorsey and Individual B.H., into making false statements to the police. Lenzi turned over two letters to Valdosta Police, which he received from Dorsey. See Exhibit Q. In one letter, Dorsey stated that Lenzi should say that he earned the money police found on Lenzi from modeling and personal training. He also stated, "I have a bunch of guys here ready to work when we get out. And they are all prepared to help replace everything you lost." He stated, "Just remember all the good times and how I treated you." In the second letter, he writes, "I will send an affidavit over to you saying you knew nothing about [Individual B.H.] sexual stuff. Also anything in the statement I write about [Individual B.H.]  I need you to agree with I'm gonna have to throw her under the bus a little bit to get you out." On the back of the second letter, Dorsey included instructions as to how to get

12

into Dorsey's email accounts, including modontouchamerica@gmail.com which Dorsey had used to contact Individual D in November 2016.[5]

### D.    **Dorsey's Treatment of his Workers**

The individuals Dorsey recruited online to participate in his prostitution operation shared similar qualities: they each had financial need, difficult family situations and/or substance abuse issues. Dorsey exploited their loneliness, need for money, and lack of family connection to keep them working in his prostitution operation despite the fact that they could easily have earned more money working on their own. For example:

- Individual A graduated high school in May 2013. Several months later, after his seasonal job ended, he responded to Dorsey's ad seeking masseurs. Ex. A at 1-2. At their first meeting, Dorsey instructed Individual A to massage him, while he touched Individual A, and directed Individual A to massage his penis to ejaculation. After that massage, he paid Individual A $100, promised him that he'd make $150,000 a year and let him drive his Audi R8. Dorsey promised Individual A no one would find out he was doing male massages. Ex. A at 1-2.

- Individual B dropped out of high school and moved out of Illinois to work odd jobs. When he was 21, he moved back to Illinois to live with his grandparents. It was then that he responded to Dorsey's online ad seeking male masseurs. During Individual B's first meeting with Dorsey, Dorsey promised him that he'd make more than $800 per week and showed him pictures of his cars. When Individual B said he didn't know how to do massage, Dorsey told him that he could practice on Dorsey. During this massage, Dorsey attempted to perform oral sex on Individual B, who pushed him away. In the second meeting Individual B had with Dorsey, Dorsey touched him during the massage, and told Individual B that clients would want him to "jack them off." Ex. B at 1-3.

---

[5]   In addition, the United States obtained a search warrant for the modontouchamerica@gmail.com email account. Based on the contents of the account, it was used by Dorsey.

- Individual C was in his late twenties when he started working for Dorsey. He struggled with addiction to cocaine and heroin at the time, and testified that Dorsey took him to buy drugs on approximately three occasions when he worked for Dorsey. Ex. D at 17, 23-26.

- Individual D was 19 years old when he responded to Dorsey's backpage.com ad seeking male masseurs. During his first meeting with Dorsey, Dorsey promised him he'd make a lot of money doing massage with "hand jobs." When Individual D returned for a second meeting, Dorsey touched him during the massage, and directed him to give him a "hand job" at the end. Dorsey requested oral sex, which Individual D refused, and then paid him $180. Exhibit E at 1-3. In March of 2017, Individual D was arrested after he attacked officers, responding to a 911 call in which he stated he wanted to commit suicide. Individual D suffers from various mental health issues, including schizophrenia and bipolar disorder.

- Individual KL and Chris Carrera, both of whom worked for Dorsey, were recovering addicts.[6] Dorsey told Brookhaven police that he had promised Individual KL's family he would take care of him. When Individual KL called 911 in Brookhaven, GA, to report that he was afraid that Dorsey was going to force him to perform sex acts, responding officers obtained a search warrant for Dorsey's motel room. In executing that warrant, in addition to credit cards, phones, and computers, officers recovered a syringe and a brillo pad. One of the responding Brookhaven PD officers specifically noted that Individual KL appeared to be high and admitted to taking methamphetamine.

- Individual IT met Dorsey when he was approximately 20 years old. Individual IT and others were examining Dorsey's car, a Dodge Viper. When Individual IT asked how Dorsey could afford a car like that, Dorsey explained that he managed male masseuses and offered him a job. Individual IT initially declined, but later, when looking for a job, contacted Dorsey. Dorsey first allowed Individual IT to perform massages without engaging in sex acts, but then told him that he would need to start letting customers touch his genitals and perform oral sex on him. Individual IT stated that Dorsey tried to engage in sex acts with him and became angry when he was refused. Ex. G at 1-2.

---

[6] As discussed earlier, Individual KL lied to agents and police regarding what he knew about Dorsey's business. KL has criminal convictions for theft, DUI, and domestic battery.

- Anthony Mrdjenovich was approximately 19 years old when he responded to Dorsey's backpage.com ad seeking male masseuses. Ex. K at 8. He met with Dorsey and Scheau in Dallas, Texas in September of 2014. *Id.* at 9-10. Scheau taught him how to perform the erotic massage. *Id.* Mrdjenovich struggled with PTSD, anxiety, and ADHD arising out of events which occurred prior to his adoption at the age of 4 and a half. Ex. K at 4-5. Mrdjenovich stopped taking his medications at age 16. *Id.* at 4, and was arrested and convicted of aggravated robbery before he graduated high school. *Id.* at 7.

When these men first met Dorsey, Dorsey took semi-nude photographs of his recruits, which Dorsey used in his online advertisements. See, e.g. Exhibit A, pp. 1–4, 9; Exhibit B, pp. 2–3, 6; Exhibit C, pp. 1, 5; Exhibit D, p. 18–19, 24–25; Exhibit E, pp. 1–3; Exhibit F, pp. 6–9. Dorsey then threatened to send those photographs to his recruits' family and friends, including those of Individual A and Individual B , as a means of maintaining control over them. Further, Individual D testified Dorsey did send his friends messages saying that Individual D performed hand jobs on men for money.

Dorsey physically and emotionally abused his recruits. He punched them and hit them. He degraded them in private and in front of others, telling him that they were worthless. For example:

- Individual A testified in the grand jury that when he fell asleep in Dorsey's car while Dorsey was trying to talk to him, Dorsey got mad and called him his "ho." Dorsey threatened to "strand" Individual A in Houston. Once Individual A took his things and tried to leave, Dorsey convinced him to stay by promising he'd make money and drive nice cars. Ex. A at 17. Individual A testified to seeing Dorsey stick a knife in Individual N.P.'s face, and hit Individual B when Individual B brought a stripper to the hotel. *Id.* at 21. Individual A testified that Dorsey would say to him, "without me, you're nothing" and "I'm pretty much your last chance." Further, Individual A testified that Dorsey told him that he had Individual C.B. beat up Individual N.P. for calling Dorsey

15

the n-word and showed Individual A a photo of Perez sitting in Dorsey's car beaten up. *Id.* at 24.

- Individual B testified that Dorsey hit him when he brought a woman back to the hotel. Ex. B at 19. He further testified that Tim "put me down all the time, *id.* at 19-20, and would "try to tear me down by calling me names like white trash, lowlife, and scumbag." *Id.* at 25.

- Individual C told federal agents that Dorsey slapped him and kept his money. Ex. C at 4. Individual C at the time was using drugs, and stated that Dorsey made sure Individual C could get out to use drugs. *Id.* at 5. Individual C further testified that Dorsey was insulting and "would break you down to the point of no return." Ex. D at 24. Individual C further testified that he saw Dorsey throw hot coffee on Mrdjenovich because Mrdjenovich's phone was on silent. Ex. D at 34.

- Individual D testified that Dorsey slapped Individual C, kept Individual C 's money, and kept him on drugs, even taking him out to buy cocaine. Individual D described that Dorsey would tell him "you're not all that" and "I could have so many other guys doing the same things as you" and that "my only value in life was doing massages." Individual D described how Dorsey would insult his appearance, tell him he couldn't survive in any other job, and that he wouldn't amount to anything. Ex. E at 4-7.

- Individual A.K., who worked for Dorsey in 2014 and 2015, told agents that he heard conversations between Dorsey and Individual J.T., another of Dorsey's workers, in which Dorsey told Individual J.T. that he was worthless and would never amount to anything. Individual A.K. said that Dorsey knew how to read people, find a weakness, and then hammer at it.

Dorsey also threatened his recruits in order to keep them from leaving his operation and working on their own. For example,

- Dorsey threatened Individual A that, if Individual A quit Dorsey's operation and went to work on his own, Dorsey would provide his grandmother with some of the semi-nude pictures that Dorsey had taken of him. See Exhibit A, p. 7.

- Similarly, Dorsey threatened Individual B that, if Individual B quit Dorsey's operation and went to work on his own, Dorsey would either "fuck [him] up" or provide his grandmother with some of the semi-nude pictures that Dorsey had taken of him. See Exhibit B, p. 24. In

16

particular, Individual B testified that Dorsey said that "if you fuck up or do something stupid like go into business for yourself, I'll set up a massage and you will get hurt." *Id.* at 13.

- Dorsey threatened Individual C that, if he ever stopped working for Dorsey and went out on his own, Dorsey would kill him. Ex. D at 20-21At one point, Dorsey showed Individual C a stack of money and said that it was set-aside in the event that any of his workers "fucked up." Individual C took this to mean that Dorsey would pay someone to kill him if he left Dorsey's operation. See Exhibit C, pp. 4, 8; Exhibit D, pp. 21–24.

- Individual C also stated that Dorsey approached him in June 2015 to request that Individual C would kill (Individual A) because (Individual A) had gone out on his own working. Ex D at 34-35.[7] According to Individual C, Dorsey said that he would approach (Individual A) as a client, shoot (Individual A) at the hotel, then shoot (Individual A) in the head to ensure he was dead. *Id.*

- After Individual B.B. quit working for Dorsey and went out on his own, Dorsey confronted him and told him not to work in areas where Dorsey's operation was active, including Chicago. Dorsey threatened Individual B.B. that if he continued to work in Chicago, Dorsey would schedule a massage appointment with him using an alias and proceed to beat Individual B.B. up when he arrived for the appointment. See Exhibit H.

- Individual A.O., another former worker for Dorsey, also told the FBI that Dorsey told Olson that if his employees leave, Dorsey puts a "hit" on them.[8] Dorsey asked Individual A.O. to kill a former worker, a request Olsen refused. *See* Exhibit R.

### E. Dorsey's Involvement in the Murder of Philip Scheau

Phillip Scheau was one of Dorsey's workers. On February 27, 2015, Scheau was

shot multiple times outside of a Motel 6 in Schiller Park, Illinois. Anthony

---

[7] Individual C reported this when interviewed by FBI agents in 2015, before anyone was charged with Scheau's murder.

[8] Individual A.O. has numerous felony convictions, including for forgery and a a weapons offense as well as a misdemeanor conviction for theft-false representation.

Mrdjenovich, another one of Dorsey's recruits, was convicted of murdering Scheau. Mrdjenovich had initially told police – and testified in the state grand jury – that Dorsey committed the murder. Mrdjenovich later recanted, and told Schiller Park police that he had shot Scheau at Dorsey's direction. At trial, Mrdjenovich testified that Individual B murdered Scheau at Dorsey's direction. As discussed below, although Mrdjenovich lied about his role in killing Scheau, there is significant circumstantial evidence that establishes that Dorsey directed the murder.

### 1.     Prior to Scheau's Murder

Mrdjenovich reported that he and Scheau were working for Dorsey in Texas in early 2015. While in Dallas, Dorsey and Scheau got into an argument about Scheau's decision to stop working for Dorsey. Scheau promised Dorsey that he would not post any of his own online advertisements. Dorsey told Mrdjenovich, "I'm gonna kill that mother fucker if he posts an ad." In the days following Scheau's departure for Chicago, Dorsey looked to see if Scheau posted any online massage advertisements. When Dorsey discovered that Scheau was posting ads, Dorsey told Mrdjenovich, "We're gonna kill that mother fucker."

Mrdjenovich's statements are corroborated by the following:

- Priceline.com records show that in January 2015, Dorsey paid for a hotel reservation in Scheau's name at a hotel in Houston and that Dorsey made reservations at the multiple hotels in Dallas throughout February 2015.

- A voicemail log recovered from Scheau's phone (ending in X9093) reflects contact with Dorsey and Mrdjenovich in January and February 2015. In particular, on February 15, 2015, Mrdjenovich left Scheau a voicemail, in which he said, "Tim is looking for you. Your guy is here." Based on the content of the message and the statements of others of Dorsey's recruits, it can be inferred that Mrdjenovich was telling Scheau

that Dorsey was looking for him because a client was present for an appointment.

- According to data from Spirit Airlines, recovered from Scheau's phone, on February 17, 2015, Scheau flew from Dallas to Chicago.

- Individual A.K., a former worker of Dorsey's, told Schiller Park police that he had spoken to Scheau several days before the murder, and that Scheau told A.K. that Dorsey became upset when Scheau left him, and specifically that Dorsey was angry and began crying.

Further, telephone records and texts recovered from one of Scheau's telephones demonstrate that Dorsey and Scheau were in contact prior to the murder, but not after the murder.

In early 2015 and continuing until February 24, 2015, Dorsey and Scheau were in frequent contact by text and telephone calls. According to phone records for two telephones subscribed to and used by Dorsey (one ending in X1959 and the other ending in X5928), Dorsey called a telephone number ending in X9093 (based on the contents of the phone, used by Scheau) a total of 938 times between January 1 and February 22, 2015. Scheau, in turn, used the X9093 number to call Dorsey's X1959 telephone 862 times during the same time period. Further, Scheau used a second number ending in X7571. That number called Dorsey's X1959 telephone 8 times between February 23 and 24, 2015, and Dorsey's X1959 phone called Scheau's X7571 phone 11 times between February 4 and February 24, 2015. On February 23, 2015, Dorsey used another phone subscribed to him (ending in X5928) to contact Scheau.

After Scheau returned to Chicago, according to toll records, he and Dorsey had frequent contact. Specifically, in the days leading up to the murder (February 21 through February 24, 2015), Dorsey and Scheau talked frequently:

19

First, according to text messages recovered from Scheau's phone, he and Dorsey exchanged the following texts on February 21 and 22, 2015. The green arrows denote an outgoing message and the red arrows denote an incoming message:

**Timothy Dorsey**

| | | | | | | Time | To/From | Number | Text |
|---|---|---|---|---|---|---|---|---|---|
| ✅ | | | | ↙ | 💬 | 02/22/2015 21:35:15 CST | Timothy Dorsey | (281) 896-1959 | Ok very good |
| ✅ | | | ∞ | ↗ | 💬 | 02/22/2015 21:31:42 CST | Timothy Dorsey | (281) 896-1959 | I'll try and call tomorrow afternoon after my doctors appointment |
| ✅ | | | | ↙ | 💬 | 02/22/2015 21:21:08 CST | Timothy Dorsey | (281) 896-1959 | Been trying to call. Hope u haven't frozen to death up there....:-D |
| ✅ | | | | ↙ | 💬 | 02/21/2015 21:59:59 CST | Timothy Dorsey | (281) 896-1959 | Excellent! Talk to you tomorrow :-D |
| ✅ | | | ∞ | ↗ | 💬 | 02/21/2015 21:56:00 CST | Timothy Dorsey | (281) 896-1959 | It's been good. Freaking cold, I may have picked one of the worst times possible to be in Chicago. But otherwise amazing. It's been great catching up, on sleep family, friends. Got a new tattoo yesterday. |
| ✅ | | | | ↙ | 💬 | 02/21/2015 14:48:29 CST | Timothy Dorsey | (281) 896-1959 | How's it going up there? |

Second, telephone toll records show additional contact between Scheau and Dorsey:

| Date | Time | Call Direction | Duration (approx..) |
|---|---|---|---|
| 2/22/15 | 3:31 p.m. | Scheau to Dorsey | text |
| 2/23/15 | 2:13 a.m. | Dorsey to Scheau | 8 sec. |
| 2/23/15 | 2:52 a.m. | Dorsey to Scheau | 9 sec. |
| 2/23/15 | 5:26 a.m. | Dorsey to Scheau | |
| 2/23/15 | 8:04 a.m. | Scheau to Dorsey | 6 mins |
| 2/24/15 | 1:40 a.m. | Scheau to Dorsey | Text |
| 2/24/15 | 2:10 a.m. | Dorsey to Scheau | Text |
| 2/24/15 | 3:51 p.m. | Dorsey to Scheau | 26 min |

20

| 2/24/15 | 4:32 p.m. | Dorsey to Scheau | Text |
|---------|-----------|------------------|------|
| 2/24/15 | 4:33 p.m. | Dorsey to Scheau | Text |
| 2/24/15 | 4:34 p.m. | Dorsey to Scheau | Text |
| 2/24/15 | 4:34 p.m. | Dorsey to Scheau | Text |
| 2/24/15 | 6:07 p.m. | Scheau to Dorsey | 20 seconds |
| 2/24/19 | 6:08 p.m. | Dorsey to Scheau | 25 min |
| 2/24/19 | 6:33 p.m. | Dorsey to Scheau | 1 min |
| 2/24/19 | 6:34 p.m. | Dorsey to Scheau | 10 min |

By contrast, Mrdjenovich (whose phone number was in Scheau's phone) and Dorsey (using either the X1959 or X5928 telephones) also had frequent contact in January and February 2015, but they do not contact each other by phone after February 21, 2019. No contact with Mrdjenovich was found on Scheau's phone ending in X9309 or in records for Scheau's X7175 phone obtained by Schiller Park police.

### 2. Trip to Chicago

Mrdjenovich stated that Dorsey rented a Chevrolet Spark to get to Chicago, and that the two drove up together. Originally, Mrdjenovich told detectives that Dorsey used a burner phone to schedule a massage appointment with Scheau at a motel in Schiller Park; at trial, Mrdjenovich claimed that Dorsey gave the phone to Individual B and told him to make the appointment.

Mrdjenovich's statements are corroborated by the following:

- American Express and Enterprise Rent-A-Car records show that on February 26, 2015, at 3:29 p.m., Dorsey used his driver's license and

21

American Express card to rent a Chevrolet Spark in Dallas. Dorsey provided Enterprise with his driver's license and two contact numbers, one of which was the X5928 number and the other which was Scheau's telephone number ending in X7571.

- American Express records show that on February 27, 2015, Dorsey's American Express card was used to make purchases in Texas, Oklahoma, Missouri, and Illinois. One of the transactions was a $144.31 payment to the Illinois Secretary of State. According to Secretary of State records, in Joliet, Illinois at 4:03 p.m. on February 27, 2015, Dorsey signed a receipt for a $141 charge to renew a vanity license plate for one of Dorsey's cars, a 2012 Audi coupe. Ex. N.

- Scheau's ex-fiancée, Individual Y.I., told investigators that she had been helping to schedule Scheau's massage appointments after he left Dorsey's operation. She told agents that someone using phone number 682-701-0357 had booked an appointment with Scheau for 9:30 p.m. on February 27, 2015 – 20 minutes prior to the murder. She further told police that she received a text from Scheau's phone ending in X7571 at 9:46 p.m., four minutes before Scheau was shot. In that message, Scheau stated, "here to give massage getting a weird vibe, we will see."

- Metro PCS records for telephone number 682-701-0357 show that it was activated on February 26, 2015, and subscribed to a "Jake LeGraw" of San Antonio, Texas. According to Metro PCS records, the first call made using 682-701-0357 was a 1:37 p.m. call to the telephone number listed in a massage advertisement that Scheau had posted to Craigslist at approximately 10:41 a.m. on the morning of February 27, 2015. The two phones exchanged calls three more times that day, the last occurring from Scheau's phone to the X0357 phone at approximately 9:47 p.m.

### 3. Dorsey Directs Mrdjenovich to Murder Scheau

When he confessed to Schiller Park detectives, Mrdjenovich stated that Dorsey directed Mrdjenovich to shoot Scheau when he showed up for the appointment. Dorsey dropped Mrdjenovich off across the street from the Motel 6. Mrdjenovich crossed the street and approached Scheau, who was standing outside in the parking lot behind the motel. Mrdjenovich shot Scheau in the torso. Scheau tried to flee across the parking lot. Mrdjenovich chased after him. Scheau collapsed on the ground.

Mrdjenovich then shot Scheau in the head at "point blank" range. Mrdjenovich took Scheau's wallet and phone, then fled the scene. Mrdjenovich got into a cab and proceeded to a nearby Dunkin Donuts, where Dorsey was waiting for him. Together, they drove back to Texas. On the trip back, they threw the burner phone and Scheau's cell phone out the window onto the highway.

At trial, Mrdjenovich testified that he and Dorsey picked up Individual B in Chicago and Dorsey gave Individual B a phone, with the instructions to schedule a massage appointment with Scheau. Mrdjenovich then testified that Dorsey gave Individual B a gun, and they dropped Individual B off at a Dunkin' Donuts across from the Motel 6. After dropping Individual B off, Dorsey and Mrdjenovich pulled into the Motel 6 lot where he was able to observe the murder. See Ex. K pp.39-63.

Mrdjenovich's statements regarding Dorsey's presence just prior to the murder are corroborated by the following:

- Video surveillance footage from a Red Light Camera and Shell Gas station camera across the street from the Motel 6 show a white Chevrolet Spark pulling into the parking lot just south of the station. Video shows a man matching Mrdjenovich's general build walking northbound across Lawrence Avenue towards the Motel 6 minutes before the murder. Meanwhile, after dropping Mrdjenovich off, the Chevrolet Spark pulls out of the parking lot and heads southbound down River Road.

- According to American Express records, charges were made at gas stations in Illinois, Missouri, and Oklahoma on February 28, 2015, consistent with Mrdjenovich's statement that he and Dorsey drove back to Texas after the murder.

- Enterprise Rent-A-Car records show that Dorsey returned the Chevrolet Spark to Enterprise in Dallas on March 16, 2015. The car had been driven approximately 3,448 miles.

Finally, following Scheau's murder, neither Dorsey's X1959 or X5928 telephones contacted any known telephone numbers for Scheau, notwithstanding that the two had been in touch almost daily prior to February 25, 2015. Further, cell site data for Dorsey's primary phone, X5928, shows that there were no cell site hits between February 26, 2015, and March 2, 2015.

### 4. Conclusion

Dorsey threatened numerous workers that if they left his employ, Dorsey would make an appointment with them and then kill them. As Individual C testified, Dorsey asked Individual C to kill Individual A , because Dorsey believed Individual A had gone into the business for himself. Scheau's murder followed exactly this pattern. Scheau had recently left Dorsey's employ. Dorsey maintained close contact with him until three days prior to the murder, consistent with the time Mrdjenovich said he learned that Scheau was posting his own ads. Dorsey, who'd lost a profitable worker, had every incentive to be angry with Scheau.

Admittedly, Mrdjenovich twice lied under oath – first in the grand jury, and then at trial – regarding who shot Scheau. However, Mrdjenovich's testimony regarding Dorsey's involvement in the plan to kill Scheau has remained consistent.

Further, the available circumstantial evidence corroborates Mrdjenovich's account: American Express records, car rental records, and Secretary of State information all point to Dorsey being in Chicago with Mrdjenovich. The car Dorsey rented dropped Mrdjenovich off across the street from the Motel 6 minutes before the murder. We know there was a driver in the Chevy Spark who dropped off Mrdjenovich – that driver was more likely than not Dorsey, who'd rented the car and accompanied

Mrdjenovich to Chicago. It is simply not consistent with how Dorsey operated his prostitution business that he would make two 14 hour drives - from Texas to Chicago, and then Chicago to Texas, between February 26 and 28, 2015, unless he was trying to get to Chicago as quickly as possible to exact revenge on Scheau, Dorsey, not Mrdjenovich, had the motive to want Scheau dead, and the manner in which he was killed is consistent with both Dorsey's threats to his workers and his use and attempted use of other masseuses to carry out violent acts, including his request to Individual C to kill Individual A, and his statement to Individual A that Individual C.B. beat another masseuse at Dorsey's direction.

### F. Defendant's History and Characteristics

Defendant's history and characteristics demonstrate the need for a sentence significantly above the Guidelines range in order to protect the public and deter defendant from further criminal activity.

Defendant has demonstrated to this Court that a jail sentence did not deter him from prostituting individuals for profit. Defendant was released from prison in June 2016, and less than six months later he was again conducting an interstate sex trafficking operation for which he was arrested in December 2016.

Further, defendant has exhibited disregard for the Court's rules and those of the prison. He lied to Probation regarding his discharge from the army, and he misused the MCC's phone system for personal profit. PSR at 18, 21-23.

He further lied and minimized to Probation regarding his involvement in the offense. PSR at 8. As discussed above, his claims that he was trying to run a

25

legitimate business and merely "turned a blind eye" to the sexual conduct is wholly false.

Defendant's inability to be deterred and his failure to accept responsibility for his offense demonstrate that, in addition to the need to adequately punish him for the extent of his conduct, this Court's sentence needs to be significant in order to deter him from continuing to offend and to impress upon him the seriousness of the need to respect the law.

G.   **The Need to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment and Deterrence**

Defendant trafficked in persons. Those in his employ were adults. They made money from the sex acts they performed. Many ultimately left his organization. But their collective testimony regarding the way in which they were recruited, and remained, in Dorsey's organization speaks to Dorsey's ability to manipulate vulnerable individuals through shame, fear, threats, and even supposed friendship and affection. Dorsey wasn't just a mere participant in criminal activity. Instead, Dorsey exercised management responsibility over the operation and assets of the organization, and while he does not qualify for an enhancement pursuant to Guideline 3B1.1, his role can be considered as a basis for an upward departure. *See* Guideline 3B1.1, Application Note 2. Further, Dorsey was not simply employing workers in furtherance of his criminal scheme - instead, he maintained control over his workers by breaking them down mentally and persuading them that they were worthless trash. His exploitation of other persons for his own profit is extraordinarily serious.

It is Dorsey's involvement in the murder of his former worker, however, that demonstrates that a sentence well above the advisory Guidelines range is warranted. Dorsey threatened harm to those who left his employ, and in February 2016, he used Anthony Mrdjenovich to make good on his threat to kill Philip Scheau after Scheau began working on his own. The nature and seriousness of the offense is aggravated by Dorsey's involvement in the murder of Philip Scheau.

Further, defendant has already demonstrated to this Court that he has no respect for the law. He resumed pimping in June 2016 after a year's custody for the same conduct in Georgia. When arrested for a second time in Georgia, on the charges that form a basis for case 19 CR 299, he attempted to obstruct justice by requesting that his co-defendant sign a false affidavit and promising him that he'd take care of him once released from prison. During the time he has been in custody in Chicago in case 17 CR 299, he used his phone password and email account as currency, taking over $4,600 from inmates for allowing them to use his phone and email access for their own benefit. Finally, in order to curry favor and sympathy with this Court, he lied to the Probation Officer regarding the reasons for his discharge from the U.S. Army and significantly minimized and denied the offense conduct which formed a basis for his conviction.

An advisory Guidelines sentence is wholly insufficient to capture the extent of Dorsey's conduct and the harm he caused, or to provide adequate deterrence given Dorsey's history and characteristics. For the reasons set forth above, a sentence of 8-10 years' imprisonment is sufficient, but not greater than necessary, to punish

defendant for the offense and the murder he directed and sanctioned against a former member of his organization.

## III.   SUPERVISED RELEASE

### A.   The Conditions and Duration of the Term of Supervised Release Recommended by the Probation Office is Appropriate to Protect the Public

Pursuant to 18 U.S.C. § 3583(b)(2) and Guideline § 5D1.2(b)(2), the Court may impose a term of supervised release of no less than five years and up to life. PSR at 24.

The government recommends that this Court impose a five-year term of supervised release, which is sufficient, but not greater than necessary, to accomplish the aims set forth in 18 U.S.C. § 3553(a) and § 3583. A five-year term of supervised release provides a significant period during which defendant will be supervised as he reintegrates into society given his prior lack of legitimate employment and the fact that he reoffended less than two years after release from his 2016 pimping conviction. In addition to protecting the public from defendant for a period of time sufficient to ensure that he does not reoffend, a five-year term of supervised release provides the necessary structure and supervision to ensure that defendant will take advantage of the treatment and training options provided in order to further protect the public.

The government has no objection to the proposed conditions of supervised release proposed by the Probation Office – these conditions are appropriately tailored to permit the Probation Office to monitor defendant while on supervised release, deter defendant from reoffending, and protect the public.

### B. **Additional Proposed Condition of Supervised Release**

In addition to the conditions proposed by the Probation Office, the government also requests that this Court impose the following Discretionary Condition #6 which expands the list of persons with whom the defendant is prohibited from meeting or communicating with, and clarifies the definition of "communicating with." The government's proposed Discretionary Condition #6 is as follows (additions to the proposed condition are in italics):

You shall not knowingly meet or communicate *(whether directly or indirectly)* with any person whom you know to be engaged, or planning to be engaged, in criminal activity and shall not knowingly meet or communicate with the following persons: Individuals A, B, C, D, E, B.H., *Matthew Lenzi, Christopher Carrera, and Individuals I.T., B.B., A.O., K.L, C.C., A.K., C.B., N.P., and any other individual who previously worked for or with Dorsey as a prostitute and/or masseuse.* The government will submit a memorandum to the Probation Office and to defense counsel specifically identifying the true names of the individuals described above so that defendant can be specifically advised of the persons with whom he is prohibited from communicating and/or meeting.

The above proposed condition is appropriate to prevent Dorsey from (1) intimidating or retaliating against those who provided information to authorities and from (2) seeking to recruit former workers back into any prostitution enterprise, which numerous former workers have testified to and/or reported to agents during the investigation.

## IV.   CONCLUSION

For the reasons set forth above and in its Government's Version of the Offense, the government respectfully requests that this Court impose a sentence within the range of 8-10 years' imprisonment.

Respectfully submitted,

JOHN R. LAUSCH, JR.
United States Attorney

By: _s/Maureen E. Merin_
JARED C. JODREY
MAUREEN E. MERIN
Assistant United States Attorneys
219 S. Dearborn Street
Chicago, Illinois 60604
(312) 353-1457